# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

MARTA MALDONADO-ORTIZ

    Plaintiff

           v.

LEXUS DE SAN JUAN

    Defendant

**Civil No. 09-1771 (SEC)**

## OPINION AND ORDER

Pending before the Court is Defendant HVPH Motor Corporation d/b/a Lexus de San Juan's ("Defendant" or "Lexus") Motion for Summary Judgment (Dockets ## 34, 26 & 37), and Plaintiff Marta Maldonado-Ortiz's ("Plaintiff") opposition thereto (Dockets ## 55 & 56 ). After carefully considering the filings, the evidence on the record, and the applicable law, Defendant's motion is **GRANTED**.

### Procedural Background

On August 7, 2008, Plaintiff filed the present suit against Defendant under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., and several state laws. According to the complaint, Plaintiff was discriminated against due to her medical conditions and was subjected to sexual harassment. Plaintiff further avers that Defendant interfered with her rights under the FMLA.

On September 30, 2010, Defendant moved for summary judgment arguing that Plaintiff failed to establish a prima facie case under the ADA because she did not suffer an adverse employment action, she is not disabled within its meaning and she cannot perform the essential functions of her position with or without reasonable accommodation. Docket # 36. Moreover,

they aver that her claims under Title VII, the FMLA, and for failure to provide reasonable accommodation also fail. Plaintiff timely opposed.

**Standard of Review**

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ramírez Rodríguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005).   In reaching such a determination, the Court may not weigh the evidence.  Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994).  At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact in issue that is both genuine and material.  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted). "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 116 (1st Cir. 2005)(citing Garside, 895 F.2d at 48 (1st Cir. 1990)); see also SEC v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008).

In order to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. See Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d

5, 8 (1st Cir. 1990).  Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact.  Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).  Once the party moving for summary judgment has established an absence of material facts in dispute, and that he or she is entitled to judgment as a matter of law, the "party opposing summary judgment must present definite, competent evidence to rebut the motion."  Méndez-Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (citing Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

"The non-movant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue. . . .  Failure to do so allows the summary judgment engine to operate at full throttle."  Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); Medina-Muñoz, 896 F.2d at 8 (citing Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.").

**Applicable Law and Analysis**

The uncontested facts are as follows. HVPH is a corporation which operates under the business name of Lexus de San Juan and manages a car dealership that sells Lexus cars and provides general car maintenance and repair services.[1] Lexus' SUF ("SUF"), Docket # 56, ¶ 1. For Lexus, client satisfaction is paramount, therefore the most important person in the dealership is the client. Id. at 2. Pursuant to their website, Lexus' "commitment to perfection

---

[1]    The Lexus dealership is located in Ave. John F. Kennedy, Km. 3.9, Puerto Nuevo, Puerto Rico.

is exceeded only by our commitment to offer you the highest levels of guest services in the luxury automotive industry." Id. Their service department supports the dealership's business by providing the best possible service to Lexus' clients, and its commitment to maintaining the highest level of service has earned it the recognition of providing the best service in the automotive industry in Puerto Rico. Id.[2]

*Plaintiff's employment at Lexus*

Plaintiff applied for a position at Lexus on May 23, 2000, and was hired on June 1, 2000, as an Assistant Manager in the Service Department.[3] Id. at 3. The Assistant Manager in the Service Department is a very important position for Lexus because he or she is the first in line to attend clients that request car service. Id. at 4. As an Assistant Manager, Plaintiff was directly responsible of making sure that the car service operation fully complied with the clients'

---

[2]   Plaintiff argues that this statement is self serving and should not be considered by this Court. This Circuit, however, has held that a "party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000) (citing Cadle Co. v. Hayes, 116 F.3d 957, 961 n.5 (1st Cir. 1997). Said statements are not based on speculation and assumptions, and instead are set forth in the company's website and it is reasonable that Victor Carrión, as Service and Parts Director, and Myrna López, as Human Resources Manager, are competent  to testify to such matter and have first hand knowledge regarding said information. See Acosta v. Harbor Holdings & Operations, Inc., 674 F. Supp. 2d 351, 357 (D.P.R. 2009); Hoffman v. Applicators Sales and Serv., Inc., 439 F.3d 9, 16 (1st Cir. 2006). Insofar as Plaintiff did not properly oppose the same, they will be deemed admitted when ruling on the present motion.

[3]   At Lexus, the personnel who provide service in this department are divided into teams. SUF at 7. Each team is composed of an Assistant Manager, a Team Leader, and a team of four (4) mechanics. Id. The Assistant Manager directly attends the clients, identifies the type of service the client needs and prepares the "job." Id. The Team Leader is the person who distributes the "jobs" between the team of mechanics and makes sure the "jobs" get done. Id. The Assistant Manager and the Team Leader communicate directly with each other, and they are both equally responsible for the "jobs." Id. The Team Leader and the Assistant Manager are positions of equal ranks and/or hierarchy. Id. Communication between the Team Leader and the Assistant Manager is of paramount importance, given that if they are not coordinated, the "jobs" will not get done in the correct order, and in accordance with the best interests of the clients. Id.

expectations regarding the maintenance and repairs of their vehicles. Id. She was also responsible for complying with her sales objectives, as well as the administrative responsibilities of her work team. Id.

Her duties and responsibilities included: (1) receiving the clients when they arrived at the service area of the dealership, asking questions and listening to their comments and/or concerns in order to identify the reasons for the visit; (2) providing service options, make recommendations, and provide an orientation to the client regarding the needed service; (3) preparing a service order (also known as "jobs"), and reviewing it with the client to make sure that it is correct before submitting the order to the Team Leader to start the repairs; (4) calling the clients once she received the repair estimates from the "Team Leader" to explain the estimates and get their approval before commencing the "job"; (5) providing constant follow up as to the status of the "jobs" and maintaining the clients informed; (6) answering client calls immediately and courteously, making an effort to completely fulfill the clients' expectations; (7) recommending disciplinary actions against any individual in her work team, when necessary; and (8) being punctual and carrying out the work day to the fullest. Id. at 5. Pursuant to the employment contract, as Assistant Manager, Plaintiff was paid an hourly wage and additional compensation for overtime work, or production, whichever was greater. Id. at 6. That is, Plaintiff would earn a minimum hourly wage, which could increase, depending on the money earned on servicing clients. Id.

The dealership opens its doors to its clients at 7:30. a.m. in order to allow the clients to bring the cars in for service before they have to report to their respective employments. Id. at 8. Similarly, the dealership remains open until about 6:00 p.m. so that the clients may pick up their vehicles after they finish with their respective professional responsibilities. Id. Usually clients start lining up for service about half hour before the time the dealership opens. Id. The

dealership tends to its clients in a first come first serve basis. Id. Thus when the gates open they allow the first set of cars, which are lined up in the street, to drive into a meeting area that fits approximately eight (8) cars at the same time. Id. The hours with the most volume of work at the dealership range from 7:30 a.m. to 9:30 a.m., when the clients leave their cars for servicing, and from 5:00 p.m. to 6:00 p.m. when they pick up their cars. Id.

The Assistant Managers have to be working in the dealership from 7:30 a.m. until at least 6:00 p.m. Id. at 6 & 9. Since the Assistant Managers are responsible for the "jobs" of their clients, it is particularly important that they be present during the hours with the most volume of work, which range between 7:30 a.m. and 8:30 a.m., and 5:00 p.m. to 6:00 p.m.[4] Id. That is, they have to personally be there when the clients take the car for servicing, usually in the mornings, and when they pick up their vehicle in the afternoon, at whatever time the "job" gets completed, make sure that the "jobs" have been completed and the client is satisfied with the service the dealership provided. Id. at 9. If the "job" cannot be completed in the agreed upon time, they have to make sure that the client understands the reasons, and if necessary provide the clients with service vehicles while their car is being serviced. Id. Plaintiff admits that she worked more than ten (10) hours a day, and on some occasions she worked for twelve (12) hours. Id. at 6.

---

[4]  Although Plaintiff posits that the employment contract does not provide that she had to work 10 hours a day or state the importance of being present during the high volume hours, she failed to properly contest the statements provided by Carrión and López. Under federal law, an unsworn statement signed under penalty of perjury may be used, in lieu of a sworn statement or affidavit, to support or oppose a motion for summary judgment. Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc., 982 F.2d 686, 689-90 (1st Cir. 1993) (citing 28 U.S.C. § 1746). This Court notes, however, that Defendant's assertion that "being able to work for approximately ten (10) hours a day is an essential element of the position of Assistant Manager" is a conclusion of law that is better left for us to decide if warranted`. As such, it will be disregarded when ruling on the present motion.

*Plaintiff's daily activities and her medical conditions*

Plaintiff drove a Montero Sport Utility Vehicle ("SUV") since 1994, which she used among other vehicles, while she worked at Lexus. Id. at 10. According to Plaintiff's deposition testimony, she would drive her SUV from her home in the Municipality of Las Piedras to take her kids to school in Hato Rey, and then to get to work at the dealership. Id. at 11. When she left work at around 6:00 p.m. or 7:00 p.m., she would drive the SUV to pick up her three kids, one of them in her mother's house, the other at the school or a friend's house, and the other in the Music Conservatorium, and go back home to Las Piedras. Id. In August or September 2005, Plaintiff enrolled in Phoenix University, located in San Patricio, where she took classes after work from 6:00 p.m. until 10:00 p.m. Id. After her classes ended, she would pick up her kids at her mother's house located in Floral Park, in San Juan, and then they drove back to their home in Las Piedras.  Id.

In mid-2004, Plaintiff was diagnosed with breast cancer. Id. at 13.  She was told that she had a tumor that would require surgery. Id. However, before the surgery, Plaintiff began chemotherapy in order to reduce the size of the tumor. Id. She took eight sessions of chemotherapy before the surgery was performed in December 2004. Id. at 13 & 14. Plaintiff kept working while she was receiving the chemotherapy. Id. She would take chemotherapy on Friday and would return to work on Monday. Id. at 13. She admitted, however, that she had to miss work on several occasions and Lexus always gave her permission and there were never any problems regarding her absences. Id. at 13 & 17. After her surgery, she took several medications. Id. at 14. By July 2010, Plaintiff was no longer undergoing cancer treatment and is currently required to visit her doctor once every six (6) months for routine checkups. Id.

Plaintiff claims that she became a partially disabled individual after she was diagnosed with cancer on 2004. Id. at 15. Specifically, Plaintiff claims that she was disabled because she

could not move her right arm in the same way as before, and her right chest area hurt while she was undergoing treatment. Id. She admits, however, that the surgery and treatment improved her condition, and that she has been able to move her right arms since 2005 until present. Id. She also admits that she continued to work for approximately nine (9) to ten (10) hours a day while she was undergoing cancer treatment. Id. Plaintiff further admitted that she was able to sit in her office to do paper work; talk to clients in the phone; walk and meet with clients frequently throughout the dealership; and walk to different areas of the dealership to get things done. Id. In addition, she continued driving her kids from Las Piedras to their school in Hato Rey during her treatment. Id.

While Plaintiff was being treated for her medical condition, Lexus provided economic assistance for her son's education[5] and allowed employees to collect funds during work hours to help pay for her medical expenses. Id. at 17. Lexus also made the necessary arrangements to have other Assistant Managers handle her clients, while at the same time allowing her to take the "Production" earnings, even though she was not present. Id.

Plaintiff's asthma condition, which was initially diagnosed in 2002, worsened when she underwent cancer treatment, and as a result, she began to suffer asthma episodes approximately every three to six months. Id. at 18. Currently, Plaintiff hardly suffers from asthma episodes, which occur approximately once or twice a year and they are not as strong. Id. Despite the asthma episodes she suffered every three to six months from 2005 to 2008, Plaintiff was able to work her required schedule. Id.

---

[5]  On July 28, 2004, Plaintiff wrote a letter to Judith Parra ("Parra"), Lexus' General Manager, informing her that her son Neftalí Boyer, was accepted in the Caribbean Preparatory School, and requesting a financial donation from Lexus for his education expenses. Id at 12. Plaintiff also included several documents from Caribbean Preparatory School, which reflected some of the education expenses. Id. In response to said request, on that same date, Lexus donated $650.00 to Plaintiff's son for his education expenses. Id.

In May 2006, Plaintiff suffered a fall in a restaurant called Yaya's Café, and as a result of the same, she underwent surgery on her knee on May 18, 2006.  Id. at 20. After the surgery, the doctor ordered at least two (2) weeks rest before going back to work. Id. However, Plaintiff did not follow her doctor's instructions and went back to work three (3) days after the surgery, with a bag of ice and crutches, and worked her entire shift. Id. Plaintiff admits that she voluntarily returned to work and Lexus did not pressure her to return to work. Id. After the surgery, she took therapies that lasted about two (2) to three (3) weeks, and she never had any more problems with her knee. Id. At present, her knee is fine. Id.

In 2007, Plaintiff was diagnosed with neuropathy. Id. at 28. Said condition inhibits sensitivity in different areas of the body, and as explained by her doctor, is common in people who have thyroid problems and in cancer patients. Id. She does not, however, know how she got this condition. Id. According to Plaintiff, it limited her ability to work because without medication her lumbar area swelled and she could not move as well. Id. With medication, however, her condition improved and she was able to walk. Id. In fact she continued to work after she was diagnosed with neuropathy. Id.

*Reasonable accommodation requests*

On or about July 2005, after her cancer diagnosis, Plaintiff requested that Lexus create an additional handicapped space inside the dealership so that she could park there without occupying the handicapped parking spaces reserved for the clients. Id. at 16. Plaintiff admits that after she requested the same, she was allowed to park inside the dealership when a parking spot was available. Id. Since the parking space inside the dealership is very limited, employees are not allowed to park inside the dealership, thus allowing Plaintiff to park inside the dealership was a special privilege and/or benefit. Id. Plaintiff admits that in some occasions when her parking was blocked, other employees helped to get her car by moving the cars that

were blocking hers. Id. at 47.

In 2007, Plaintiff made a second request for reasonable accommodation on this front. See Docket # 56, p. 5, ¶ 16.  On February 14, 2008, Lexus provided Plaintiff with her own parking space, located in the same area as the administrative personnel. SUF at 46. Plaintiff claims that it was "maybe more" than sixty (60) to seventy (70) feet away from the dealership. Id. She does, however, admit that there were only about eight (8) other parking spaces that were closer to the dealership than hers, including the parking for the president of the company. Id.

On October 1, 2007, Plaintiff wrote a letter[6] to Carlos Beltrán ("Beltrán"), Parra and the Human Resources Manager, Myrna López "(López"), indicating that due to medical reasons she needed a reasonable accommodation. Id. at 30. Namely she requested to work no more than eight (8) hours a day, and an ergonomic chair. Id. She included a medical certificate form Dr. Carlos Sanchez, Plaintiff's internist, stating that she could not work for more than eight (8) hours a day. Id.  In order to engage in an interactive process to determine what type of accommodation, if any, could be provided to Plaintiff, on October 8, 2007, López answered in writing to Plaintiff's reasonable accommodation request. Id. at 31. Therein, López certified receiving Plaintiff's request on October 1, 2007. Id. She further informed that in order to correctly evaluate Plaintiff's request it was necessary for Plaintiff's doctor to indicate in writing which specific duties and responsibilities were affected by her condition. Id. Additionally, her doctor had to clarify exactly how working less hours a day, and the ergonomic chair would benefit her, since the position she occupied required her to work 9.5 to 10 hours a day. Id. To facilitate said task, López attached a list of Plaintiff's duties and responsibilities to the letter. Id. López also provided Plaintiff with the necessary Forms to request a license under the FMLA.

---

[6]  The letter is dated October 10, 2007, but was received by Defendant on October 1, 2007.

Id. at 32.

On October 17, 2007, Plaintiff submitted a medical certificate from Dr. Sánchez, indicating that she was not disabled, but that he recommended that she be granted certain job accommodations, namely: (1) "8 (eight) hrs. shift/daily"; and (2) an "ergonomic chair." Id. at 33. According to Plaintiff, Dr. Sánchez told her to request reasonable accommodation because a cancer patient should not work for more than eight (8) hours a day. Id. She admits, however, that Dr. Sánchez was not the doctor who treated her cancer or her back condition. Id. Plaintiff also admits that even though she had different doctors who treated her cancer and her back condition, she only discussed her intention to request reasonable accommodation with Dr. Sanchez. Id.

On October 25, 2007, López called Dr. Sánchez and his secretary told her that he was traveling outside Puerto Rico, and that he would be back on or about November 5, 2007. Id. at 35. On November 5, 2010, López called Dr. Sánchez once again, so that he could clarify and/or explain Plaintiff's request for reasonable accommodation (ergonomic chair), and particularly his conclusion that Plaintiff was not disabled. Id. Dr. Sanchez, however could not explain exactly why she needed said specific type of reasonable accommodation because he was not the doctor who had treated those specific conditions. Id. On November 5, 2007, López told Plaintiff that her doctor had not provided the necessary information for Lexus to process her reasonable accommodation request. Id. at 36.  Moreover, she explained to Plaintiff that since Dr. Sanchez could not explain why she needed said accommodation, it was very important that her other doctors clarify why she could only work for eight (8) hours a day, given that working more than eight (8) hours a day was a requirement for every Assistant Manager. Id. at 36. In response, Plaintiff told López that she had already provided all the necessary documentation for a reasonable accommodation request, and that she was not going to fill out the FMLA Forms

because she did not want to take a FMLA leave. Id. at 37.[7] On September 10, 2008, Plaintiff affirmed her position regarding this matter in writing. Id.

Shortly thereafter, on October 31, 2007, Plaintiff inquired about the ergonomic chair to Beltrán. Id. at 38. She also informed him that López had given her some documents for her doctor to fill out, but that he had not done it because the documents were related to FMLA. Id. Despite the fact that Plaintiff had not provided the documentation requested by Defendant, a Lexus employee took Plaintiff to a store to choose an ergonomic chair. Id. at 40. While Lexus evaluated the alternatives, Plaintiff purchased an ergonomic chair and brought it to the dealership. Id. Lexus allowed Plaintiff to use her ergonomic chair, and offered to reimburse Plaintiff for the cost of the chair if she provided the information Lexus asked for explaining the basis for her reasonable accommodation request. Id.

On August 21, 2008, Victor Carrión ("Carrión"), Service and Parts Director, admonished Plaintiff in writing, based on her absence for more than twenty-one (21) occasions during the current year, including six (6) in the month of July. Id. at 50. Therein, she was reminded that she occupied a key position and that her whole work team depended on her for their daily production and income. Id. She was also told that her habitual absences were adversely affecting the operations of the dealership, the service given to their clients, and the production of her work team. Id.

On August 23, 2008, Plaintiff wrote a letter to Parra, López and Carrión, stating that she disagreed with the written admonishment she received on August 21, 2008. Id. at 51. Although she admitted that she was frequently absent, she stated that all of her absences were the result

_____

[7]  Plaintiff claims that when she took the FMLA forms to Dr. Sanchez he did not fill them out because he concluded that it was not necessary to fill FMLA forms when someone seeks reasonable accommodation. Id. at 39.

of medical treatments and that she had medical excuses for all of them. Id. She also explained that she had several medical conditions and named five (5) doctors which were treating her regarding said conditions. Id.

On August 27, 2008, López responded to Plaintiff's August 23, 2008 letter. Id. at 52. Specifically, López reminded Plaintiff that on November 5, 2007, they met and López requested additional information regarding her request for reasonable accommodation, and she had yet to receive anything from Plaintiff on this matter. Id. López further reminded Plaintiff that her treating physicians had to indicate and/or explain why she needed an ergonomic chair and shorter work day. Id. Moreover, López explained to Plaintiff that even though she had brought her own ergonomic chair, they could use that information to evaluate the possibility of reimbursing her for the cost of the chair. Id. at 53. She also reminded Plaintiff that she had not filled out the FMLA Forms, so that she could be provided with FMLA leave. Id. at 52. López explained that Lexus wanted Plaintiff to explore the possibility of requesting a FMLA leave so that she could be absent from work for an extended or intermittent period of time while she treated her condition, at the same enabling Lexus to properly operate the dealership. Id.

On September 10, 2008, Plaintiff responded to López's August 27, 2008, request, stating that she was told by the Labor Department and by her doctor, that it was not necessary to fill-out the forms related to a FMLA leave. Id. at 53. She further indicated that the documents she provided in October 2007, to wit, the medical certificate and the list of duties and responsibilities with her doctors' comments, was all that was necessary for a reasonable accommodation request. Id.

On August 22, 2008, Plaintiff sought treatment at the State Insurance Fund. Id. at 55. Plaintiff never went back to work again. Id. On June 26, 2009, however, the State Insurance Fund dismissed her case for lack of jurisdiction. Id. Despite the dismissal of said claim, Plaintiff

never reported back to work. Id. Consequently, on August 20, 2009, after Plaintiff was absent form work for approximately one year, and considering that she never indicated that she had the intention of returning to work within the period established by law, Lexus declared her position vacant, and notified her about her COBRA benefits. Id.[8]

Unbeknownst to Lexus, on or around February 2009, while still employed by Lexus and on leave under the State Insurance Fund, Plaintiff requested disability benefits from the Social Security Administration. Id. at 57. According to Plaintiff, she requested said relief because she believed that it would be very difficult to keep her job and/or find a job with a different employer because she could not guarantee that she would be able to comply with their assistance policies, given that she did not know if she would get sick, and/or go to the doctor. Id.

Plaintiff summarized her daily routine after she stopped working on August 28, 2008, in the following way: "I wake up in the morning, I do an exercise routine in the morning, I take care of my pets, my daughter, I fix breakfast for her. During the day, depending on the agenda for the day, I go out with the girl and do the errands regarding school. In addition to that, I always have commitments with the church. In addition to that, I offer my help, on a voluntary basis, to a place that purports community assistance and so depending on their needs, if they need me to do some computer work for them or what not, I'm available for them." Id. at 58. Furthermore, she takes her other two (2) kids to school from Las Piedras to Hato Rey, and wherever else they need to go, she takes her kids horseback riding and to the beach during the weekends and she takes care of her mother and takes her to buy groceries. Id. Plaintiff prepares three (3) meals every day for her and for her kids, depending on who is at her house, as well as snacks throughout the day. Id. Plaintiff also likes to go to the movies, to church and to go out

---

[8] Plaintiff does not claim any remedies such as back pay, reinstatement, front pay, nor economic loss, related to Lexus' decision to declare her position vacant. Id. at 56.

with her girlfriends. Id. When asked under oath about what life activities were affected by her conditions, Plaintiff indicated that she could not go to the malls to walk a prolonged amount of time, and when she took her kids to their sport events she would get tired very quickly and lacked the energy to stay and watch them. Id. at 59.

*Work incidents*

On June 12, 2006, Beltrán notified Plaintiff and Rafael Santiago ("Santiago"), Plaintiff's Team Leader, that Lexus was audited by Toyota de Puerto Rico and United Auto Group, and their results indicated that their work team was averaging 3.1 faults per "job," while the acceptable performance average was 1 fault per "job." Id. at 19. Thus, they were admonished that the team needed attention, and that they needed to reduce the faults per "job" immediately. Id. They were also warned that a failure to improve the Team's performance would result in more severe disciplinary actions. Id..

On January 2, 2007, Plaintiff had an incident with Alex Palermo, the porter at that time, *i.e.*, the person who receives the vehicles and assigns the jobs to the Assistant Managers like Plaintiff. Id. at 29. According to Plaintiff, on that day Palermo assigned her too many jobs, and she asked that the jobs be reassigned to other people because she was loaded with appointments. Id. She claims that after she complained, Palermo did not speak to her for a few days. Id. Plaintiff also complained to her supervisor that Palermo was not speaking to her, and after she complained he was moved to another position. Id.

On January 3, 2007, Plaintiff was covering for another Assistant Manager who went on vacations and consequently, she was in charge of both her team and his team. Id. Therefore, she knew that her work load was going to at least double. Id. The next day she was still covering for the Assistant Manager, but the work load was less. Id. Notwithstanding, she alleges that she complained to her supervisor that the day before she covered too many "jobs." Id. Plaintiff

admits that after she complained she never had to take so many appointments in one day ever again. Id.

On October 24, 2007, Beltrán sent an e-mail to López, Parra and Carrión, indicating that Plaintiff had told him the day before that she would have to leave work early again to take her son to be given a CT SCAN for his left hip, and at that time, he told Plaintiff that she should take the whole day off instead so that she could take care of all of her son's medical needs. Id. at 41. He explained that, on October 20, 2007, Plaintiff's son had an accident and he had to be taken to the hospital, and as a result, she had to leave early to take care of her son. Id. The following Monday, she got to work late because she had to take her son to the doctor, and she also left early that afternoon to take her son for a CT scan. Id. On Tuesday, she left work early again to take her son to another doctor. Id. On Tuesday afternoon she called Beltrán to let him know that she would have to leave work early again on Wednesday to take her son to another CT Scan. Id. In light of the foregoing, Beltrán asked her to take a day off in order to do all the necessary tests and avoid missing work again. Id.

On November 20, 2007, Santiago, Plaintiff's Team Leader, requested a meeting with Parra, Beltrán and Carrión, to address various problems that their work team was experiencing with Plaintiff. Id. at 42. According to an email sent by Parra to López, Beltrán and Carrión, Plaintiff's team complained that her habitual absenteeism and tardiness was adversely affecting their production, their work environment and their service to their clients. Id.[9] They also

---

[9]   When an Assistant Manager is absent, another Assistant Manager has to take over his or her workload and manage his or her work team. Id at 44. The Assistant Manager who substitutes him or her will have to deal with double the work load. Id. Also, since the Assistant Manager did not originally coordinate the job with the client, they will not know exactly what was discussed and/or agreed. Id. This has the adverse effect of delaying "jobs," which results in the dealership not being able to service the client's vehicles in a timely fashion. Id. Consequently, the client is left without a vehicle longer, and thus, increases the chances that the client will not be satisfied with the service. Id. This also adversely

complained that Plaintiff had a poor attitude, problems communicating, was giving too much priority to her university studies, was forgetful, was taking care of personal matters during work hours and was not committed to attaining the minimum daily production requirement. Id.

On January 23, 2008, Plaintiff was admonished in writing for not complying with her work schedule. Id. at 45. She was told that her actions were affecting her work team as well as the service they provided to their clients. Id. Therein, she was reminded that she had to come in to work every day from 7:30, until 6:00 p.m., with a one-hour lunch break starting at 12:00 p.m. Id. Plaintiff admits that her doctor visits were causing her to miss work and/or get to work late or leave work early. Id. at 43. Plaintiff indicated that when she worked Saturdays, she had Mondays and Fridays off, however, most of her doctors did not work on Monday and Friday. Thus albeit Plaintiff claims she made good faith attempts to schedule her visits in her free time, she could not always make doctor appointments on her free days. Id. Plaintiff admits that she did not attempt to change her doctor or find a doctor who worked on Mondays and Fridays in order to avoid frequently missing work. Id.

On July 18, 2008, Beltrán met with Plaintiff to admonish her about a situation with a client who had left the car the day before and when he went to pick it up, it was not ready and apparently the service job was not even done. Id. at 48. Plaintiff was angered at the situation and blamed her peers, specifically she explained that the vehicle was not assigned to a mechanic by the employee assigned to such task. Id. She also stated that she told the client that the estimate would take additional time. Docket # 56, p. 16, ¶ 48. On July 23, 2008, Parra admonished Plaintiff in writing about the situation that took place on July 18, 2008, and about the way she responded when her supervisor discussed the issue with her. SUF at 49.

_____

affects the work teams because it decreases their production based compensation. Id.

*Hostile work environment claims*

On Friday, January 26, 2007, while Plaintiff was having lunch with Beltrán, her immediate supervisor, she told him that her Team Leader, Santiago, was harassing her, and that it was affecting their entire work team. Id. at 21. On that same day, Beltrán notified the General Manager, Parra, and she in turn immediately informed the Human Resources Manager, López so that the appropriate measures were taken to correct the situation. Id. The following Monday, January 29, 2007, López met with Plaintiff to discuss the nature of her allegations of harassment. Id. Plaintiff told her that on or about the end of November 2006, Santiago told Plaintiff that he was falling in love with her. Id. According to Plaintiff, Santiago said that he wanted to marry her, and asked her if she still liked him. Id. At that time, Plaintiff explained that she had no interest in him, and that his unwanted behavior was creating hostility between them. Id. Plaintiff admits that she waited three months after said incident to tell her supervisors. Id.

After her meeting with Plaintiff, López met with Beltrán, Parra and Carrión, to discuss and analyze the situation and determine a course of action. Id.. at 23. They concluded that there was no sexual harassment, since Plaintiff stated that Santiago's unwanted behavior was limited to comments that were merely declarations of affection that were not sexual in nature. Id.[10] Notwithstanding, López met with Santiago on March 8, 2007, to discuss the situation and to assess how it was affecting the team. Id. Santiago admitted that on one occasion he told Plaintiff that he was falling in love with her, but states that after she rejected him, he never made any other approaches of that nature to Plaintiff. Id. He recognized that he should not have told her anything, but that due to the strong friendship that they had developed over the years, he fell in

---

[10]   These assertions are limited to what was expressed in the internal memorandum written by López insofar as whether said comments were indeed sexual in nature, and constitute sexual harassment is an issue for this Court to decide.

love with her and felt compelled to tell her. Id. He denied harassing Plaintiff in any way. Id. He also confirmed that the team was having some problems but that they met and were able to fix them. Id. Although it was concluded that no sexual harassment occurred, López gave Santiago an orientation regarding harassment in the work place, and reminded him that such behavior was not permitted, and informed him that if they ever concluded that he was sexually harassing an employee it would cost him his job. Id. at 24. Santiago assured López that he would never engage in such behavior again. Id.[11]

After meeting with Plaintiff and Santiago, and determining that no sexual harassment was taking place, López decided that no other corrective action was necessary. Id. at 26. Plaintiff admitted that once she complained about Santiago's conduct, and López admonished him, his advances stopped. Id. Nevertheless, according to Plaintiff, Santiago's hostility towards her continued. Docket # 56, p. 8-9, ¶ 26. Specifically, Plaintiff claims that after Santiago was admonished for his advances, they began to have professional problems because they were having trouble communicating. SUF at 27. She further claims that it was hard to reach work related agreements. Id. According to Plaintiff, she complained about said professional problems with Beltrán, and Santiago was re-located to another department and never worked with Plaintiff again. Id.

*ADA claims*

Congress enacted the ADA "to provide a clear and comprehensive national mandate for

_____

[11]   During said meeting, Santiago also told López that he was having professional problems with Plaintiff because she occasionally met with a friend from her University in her office at the dealership to do homework, and that it was affecting the flow of work because she was not attending his work related requests promptly while she did her homework for the University. SUF at 25. Plaintiff admitted that when she was working for Lexus she was taking marketing classes at night after work in the University of Phoenix from 6:00 p.m. to 10:00 p.m., and that one of her university peers, Jessica Galarza frequently went to her office to take documents related to her school assignments. Id.

the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

The purpose of the ADA is to protect qualified persons with a disability from discrimination in

employment. 42 U.S.C. § 12112(a).  The ADA prohibits discrimination against an otherwise

qualified individual based on his or her disability in all employment practices, including, but not

limited to job application procedures, hiring, firing, advancement and compensation. Id.

        To establish a claim under the ADA in the absence of direct evidence of discrimination,

a party must rely on circumstantial evidence and establish a *prima facie* case through the

burden-shifting framework first established in McDonnell Douglas Corp. V. Green, 411 U.S.

792 (1973). See Castro-Medina v. Procter & Gamble Commercial Co., 565 F. Supp. 2d 343, 357

(D.P.R. 2008); Salgado-Candelario v. Ericsson Caribbean, Inc., 614 F. Supp 2d 151, 167

(D.P.R. 2008). Under the *McDonnell* framework, a plaintiff first must establish a prima

facie case of disability discrimination under the ADA by proving by preponderance of the

evidence that she was: 1) disabled within the meaning of the Act; 2) able to perform, with or

without reasonable accommodation, the essential functions of her job; and 3) discharged or

adversely affected, in whole or in part, because of her disability.  Castro-Medina, 565 F. Supp.

2d at 357.

        If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to

articulate a legitimate non-discriminatory reason for its employment decision and to produce

credible evidence to show that the reason advanced was the real reason. Id. (citing Freadman

v. Metropolitan Property and Cas. Ins. Co., 484 F.3d 91, 99 (1st Cir. 2007)).  If the defendant

offers a legitimate, non-discriminatory reason, the initial inference of discrimination evaporates,

and the burden then shifts back to the plaintiff to proffer evidence to establish that the

defendant's non-discriminatory justification is mere pretext, cloaking discriminatory animus.

Freadman, 484 F.3d at 99.  The plaintiff must then muster proof that enables a fact finder to

rationally conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination.  Laurin v. Providence Hosp.,150 F.3d 52, 58 (1ˢᵗ Cir. 1998).  Notwithstanding, "the ultimate burden of proving unlawful discrimination rests at all times with Plaintiff." Castro-Medina, 565 F. Supp. 2d at 357 (citing Tobin v. Liberty Mut. Ins. Co., 433 F. 3d 100, 105 (1ˢᵗ Cir. 2005)).

*Disabled under the ADA*

The threshold question in any ADA action is whether the plaintiff can make a showing of disability. Torres-Alman v. Verizon Wireless P.R., Inc., 522 F. Supp. 2d 367, 382 (D.P.R. 2007). In order to determine whether a person is disabled under the ADA, the Court must conduct a tripartite analysis. Id. (citing Bragdon v. Abbott, 524 U.S. 624, 631 (1998); see also Carroll v. Xerox Corp., 294 F.3d 231, 238 (1ˢᵗ Cir. 2002). The plaintiff must first prove that he suffers from a physical or mental impairment.[12] Id. (citing Carroll, 294 F.3d at 238). Second, the Court must evaluate whether the life activities affected by the impairment constitute "major" life activities.[13] Id. Lastly, the impairment must substantially limit said major life activities.[14]

---

[12] Under ADA regulations, a physical or mental health impairment is defined as: "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(1).

[13] According to ADA regulations, "major life activity" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

[14] A physical or medical impairment "substantially limits" a major life activity if the person is "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1).

CIVIL NO. 09-1771 (SEC)                                                              **Page 22**

Id. Additionally, the plaintiff must possess a record of such impairment and be regarded as having such an impairment. Id. (citing 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(e)(2)(g)(1)(2)(3)). In evaluating whether an individual is substantially limited in a major life activity by reason of an impairment, the following factors should be considered: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. Id., § 1630.2(j)(1).

        Furthermore, the Supreme Court has emphasized that "[a] person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected, it does not 'substantially limi[t]' a major life activity." Sutton v. United Airlines, 527 U.S. 471, 482-83 (1999). Additionally, in order for an impairment to be "substantially limiting" within the meaning of the ADA, said impairment must be permanent or long term. Torres-Alman, 522 F. Supp. 2d at 384; see also Toyota Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002) (superseded on other grounds) (finding that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term."); Guzman-Rosario v. United Parcel Service, Inc., 397 F.3d 6, 10 (1st Cir. 2005) (in order to be "substantially limiting" within meaning of ADA's definition of disability, impairment must be permanent or long term; this may encompass conditions that are potentially long-term, in that their duration is indefinite and unknowable, but not those that are  brief or foreseeably temporary).

Plaintiff alleges, in essence, that she is disabled under the ADA due to the following medical conditions: breast cancer, asthma, a knee condition and neuropathy. The evidence submitted by Plaintiff in support of her claim that she was partially disabled for purposes of the ADA is that she was diagnosed with breast cancer in 2004; she had to undergo surgery to remove the tumor; she had to receive eight sessions of chemotherapy; and as a result of said condition she was temporarily unable to move her right arm as she did before. She further claims that her asthma condition worsened as a result of the cancer diagnosis and she suffered asthma episodes every three to six months from 2005 until 2008. Moreover, she avers that she underwent knee surgery in 2006 as a result of a fall. Lastly, Plaintiff contends that she was diagnosed with neuropathy in 2007, which caused swelling in her lumbar area and limited her ability to move effectively. As in *Torres-Alman*, however, said evidence is insufficient to allow such conclusion.

We first note that Plaintiff cannot merely rely on her diagnosis alone to prove disability under the ADA. On this point, the Supreme Court has held that: "[i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." Toyota, 534 U.S. at 184.[15] The ADA requires those "claiming the Act's protection … to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience … is substantial." Id. at 198; see also Calef v. Gillet Co., 322 F.3d 75, 83 (1st Cir. 2003); Carroll, 294 F.3d at 238; Torres-Alman, 522 F. Supp. 2d at 384; Alamo-Rodriguez v. Pfizer Pharms., Inc., 286 F. Supp. 2d 144, 156 (D.P.R. 2003).

---

[15]    The ADA Amendments Act of 2008, which went into effect on January 1, 2009, have since expanded the definition of "disability" set forth in *Toyota*. Notwithstanding, *Toyota* remains the controlling law here since the facts in this case occurred prior to 2009, and the amendments are not retroactive. Colon-Fontanez v. Municipality of San Juan, 671 F. Supp. 2d 300, n. 36 (D.P.R. 2009).

On this point, this district has held that "[b]reast cancer per se is not sufficient to render a person diagnosed with, or suffering from, said condition automatically disabled for purposes of the ADA." Torres-Alman, 522 F. Supp. 2d at 382-383. Although it may be an impairment within the meaning of the ADA, "in order for such condition to constitute a disability, the same must substantially limit the performance of one or more of plaintiff's major life activities. Id. (citing Pimentel v. Dartmouth-Hitchcock Clinic, 236 F. Supp. 2d 177 (D.N.H. 2002) (dismissing claims of disability where plaintiff took eight month medical leave for breast cancer surgery and treatment because plaintiff's conditions did not qualify as a disability under the ADA); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996) (affirming dismissal of claims of disability where plaintiff suffered from breast cancer, which required radiation treatment, necessitating a modified work schedule for one month and a half, and caused significant side effects for an additional four months; plaintiff's conditions did not substantially limit her work activity and thus did not qualify as a disability under the ADA); Schwertfager v. City of Boynton Beach, 42 F.Supp.2d 1347 (S.D.Fla. 1999) (plaintiff's breast cancer did not substantially limit her in major life activities, even though her surgery caused her to be temporarily unable to care for, dress, and cook for herself); Madjlessi v. Macy's W., Inc., 993 F.Supp. 736 (N.D.Cal. 1997) (employee's breast cancer did not substantially limit her ability to work)).

Similarly, courts have held that impairments such as neuropathy, a knee injury and asthma do not always render an individual disabled under the ADA, insofar as they must also substantially limit a person's major life activities as well as be permanent or long term. Carreras v. Sajo, 596 F.3d 25, 34 (1st Cir. 2010) (citing Scheerer v. Potter, 443 F.3d 916, 920 (7th Cir. 2006)); Lebron-Torres v. Whitehall Labs., 251 F.3d 236, 241 (1st Cir. 2001) (citing Webb v. Clyde L. Choate Mental Health & Dev. Ctr., 230 F.3d 991, 997 (7th Cir. 2000)); Benoit v. Tech.

Mfg. Corp., 331 F.3d 166, 176 (1st Cir. 2003).

In this case, it is uncontested that Plaintiff's breast cancer was treatable and her breast was saved; the surgery in December 2004 was successful in removing all of the cancerous tissue from her breast; Plaintiff worked while undergoing chemotherapy; and the only physical limitation resulting from her breast cancer was Plaintiff's temporary inability to move her right arm after the surgery and while undergoing chemotherapy. This, however, does not render her disabled for purposes of the ADA. Despite the fact that her chest area hurt while she was undergoing treatment, she took medications that have enabled her to move her right arm since 2005, she has suffered no pain in this area since then and is no longer under treatment for cancer. Additionally, although Plaintiff claims that she was disabled, she admits that she continued with her daily routine and activities during her treatment and thereafter, to wit, Plaintiff could walk, communicate, run errands, cook, take care of herself, her children and her mother, drive, engage in social activities, go to church, among others. She also kept on working nine to ten hours a day and performing her duties while undergoing treatment. Specifically, she was able to sit in her office to do paperwork, talk to clients on the phone, walk and meet with clients and walk to different areas of the dealership. Albeit she was absent on several occasions in order to receive treatment, Lexus always gave her permission.

Also, Plaintiff stated that despite her occasional asthma episodes, she was able to continue working as required. Similarly, Plaintiff admits that she was able to walk upon taking medication for the swelling in her lumbar area and continued to work after her neuropathy was diagnosed. Lastly, Plaintiff took therapies for approximately two to three weeks after her knee surgery and never experienced any more problems with her knee. Thus with the appropriate treatment and medication, Plaintiff's conditions improved and most were completely alleviated.

These facts operate against a conclusion that Plaintiff is or was disabled for purposes of the ADA. In light of the above, it is evident that none of Plaintiff's impairments permanently and substantially impaired any major life activities.

Based on the foregoing, we find that Plaintiff's conditions did not render her disabled within the meaning of the ADA. Insofar as she fails to meet the first prong of the prima facie disability discrimination case, we need not delve into the other elements. As such, Lexus' motion for summary judgment as to Plaintiff's disability discrimination claims under ADA is **GRANTED**.

*Reasonable Accomodation*

The First Circuit has noted that "[t]he federal statutes barring discrimination based on disability do more than merely prohibit disparate treatment; they also impose an affirmative duty on employers to offer a 'reasonable accommodation' to a disabled employee." Calero-Cerezo v. United States DOJ, 355 F.3d 6, 19-20 (1st Cir. 2004). Therefore, discrimination is also defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . , unless [the] covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A); see Reed v. Lepage Bakeries, Inc., 244 F.3d 254, 257 (1st Cir. 2001).

"Unlike other 'discriminations,' the plaintiff is not required to prove-through direct evidence or the McDonnell Douglas burden shifting scheme-that the employer's omission was motivated by discriminatory animus directed at the disability." Corujo-Marti v. Triple-S, Inc., 519 F. Supp. 2d 201, 215 (D.P.R. 2007). To survive a motion for summary judgment on a reasonable accommodation claim under the ADA, a plaintiff must show: (1) that she is disabled within the meaning of the ADA; (2) that she was able to perform the essential functions of her

job, either with or without a reasonable accommodation; and (3) that, despite her employer's knowledge of her disability, the employer did not offer a reasonable accommodation for the disability. <u>Torres-Alman v. Verizon Wireless</u>, 522 F. Supp. 2d 367, 385 (D.P.R. 2007); <u>Calero-Cerezo</u>, 355 F.3d at 20; <u>Tobin</u>, 433 F. 3d at 107.

Insofar as we previously held that Plaintiff failed to show that she is disabled within the meaning of the ADA, her reasonable accommodation claims must likewise fail. Consequently, the motion for summary judgment regarding Plaintiff's ADA claims for failure to provide reasonable accommodation is also **GRANTED**.

*Sexual Harassment under Title VII*

Title VII of the Civil Rights Act, "makes it an unlawful employment practice to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's... sex." <u>See</u> 42 U.S.C. § 2000e-2(a)(1); <u>see also</u> <u>Harris v. Forklift</u>, 510 U.S. 17, 20 (1993). The United States Supreme Court has interpreted the phrase terms, conditions or privileges of employment broadly, and has stated that it encompasses Congress' intent to "strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." <u>Harris</u>, 510 U.S. at 20. That is, Title VII is violated whenever "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." <u>Id</u>. (Citations omitted).

In order to succeed in a hostile work environment claim, plaintiff must show that: (1) she is a member of a protected class (in this case, her gender); (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment;

(5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive; and (6) some basis of employer liability. Rosario v. Dep't of the Army, 573 F. Supp. 2d 524, 529 (D.P.R. 2008) (citing Pomales v. Celulares Telefonica, 447 F.3d 79, 83 (1st Cir. 2006)); see also Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006).

There is no single test by which we evaluate a claim of sexual harassment to determine whether the plaintiff has presented sufficient evidence to survive summary judgment. Vera v. McHugh, 622 F.3d 17, 26 (1st Cir. 2010). Although there is no mathematically precise test, in order to determine whether an environment is hostile or abusive, the Court must look at all the circumstances, which may include: (1) the frequency of the discriminatory conduct, (2) its severity, (3) whether it is physically threatening or humiliating, (4) whether it was just a mere utterance, and (5) whether it unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 23; see also Pomales, 447 F.3d at 83; Valentin-Almeyda, 447 F.3d 85 at 94; Marrero v. Goya of Puerto Rico, 304 F. 3d 7, 18-19 (1st Cir. 2002); Lee-Crespo v. Schering-Plough del Caribe, Inc., 354 F. 3d 34, 46 (1st Cir. 2003).

Although a single act of harassment may, "if egregious enough, suffice to evince a hostile work environment," the First Circuit has noted that "[m]ost hostile work environments are bred from an ongoing series of harassing incidents." Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005). Accordingly, the "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." Harris, 510 U.S. at 20. The conduct must be sufficiently severe or pervasive for a reasonable person to find that the work environment was hostile or abusive. Id. Title VII also requires that the employee subjectively perceive the work environment as abusive. Id. Despite Title VII's protection against discrimination based on sex, the Supreme Court has clearly stated

that "the prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the conditions of the victim's employment." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998). That is, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment- an environment that a reasonable person would find hostile or abusive- is beyond Title VII's purview." Id.

Therefore, "on a motion for summary judgment in a sexual harassment case such as this, we must distinguish facts that merely add up to the 'ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing,' which can never support a Title VII claim, from those suggesting 'sexual remarks, innuendoes, ridicule, and intimidation' which 'may be sufficient to support a jury verdict for a hostile work environment.'" Vera v. McHugh, 622 F.3d 17, 27 (1st Cir. 2010) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) and O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001)).

Moreover, it should be noted that when the harassment is caused by a co-employee, the employer is liable if it knew, or should have known, of the charged sexual harassment, and failed to implement prompt and appropriate corrective action. See White v. New Hampshire Dep't of Corrections, 221 F.3d 254 (1st Cir. 2000). Furthermore, when an employer fails to take a remedial measure to stop the offensive conduct, he has "effectively ratified the harassment" when he knew of the discrimination but took no action against the offending party. Dixon v. International Brotherhood of Police Officers, 504 F.3d 73 (1st Cir. 2007) (quoting Woods v. Graphic Commc'ns, 925 F.2d 1195, 1202 (9th Cir. 1991)).

Plaintiff's hostile work environment claim hinges on the fact that on or around the end of November 2006, Santiago, Plaintiff's Team Leader, told her that he was falling in love with

her, that he wanted to marry her, and he asked her if she still liked him. At that time, Plaintiff explained that she had no interest in him, and that his unwanted behavior was creating hostility between them.  Santiago admitted that on that sole occasion he told Plaintiff that he was falling in love with her, but states that after she rejected him, he never made any other approaches of that nature to Plaintiff. Thus the conduct Plaintiff complained of lacks the necessary frequency and severity, was not physically threatening or humiliating and failed to unreasonably interfere with her work performance. Even more, Plaintiff admitted that she waited three months after Santiago's comments to tell her supervisor.

Additionally, considering that Santiago is Plaintiff's co-employee,[16] Lexus is only liable if it knew, or should have known, of the charged sexual harassment, and failed to implement prompt and appropriate corrective action. Pursuant to the record, Plaintiff complained to her supervisors on January 26, 2007, and López met with Plaintiff the next day in order to further discuss her claims. Thereafter, López, Beltrán, Parra and Carrión met to discuss Plaintiff's claims, and albeit concluding that no sexual harassment took place,[17] Santiago was duly admonished and warned to abstain from any kind of comments of this nature towards Plaintiff. As a matter of fact, Plaintiff admits that after she complained about his conduct, and López admonished him, Santiago's advances stopped. Moreover, after Plaintiff claimed that Santiago continued to display hostility towards her, he was relocated to another department and never worked with Plaintiff again. Thus based on the uncontested facts, we find that Lexus acted

---

[16]  Pursuant to the uncontested facts, the Team Leader and the Assistant Manager are positions of equal rank and/or hierarchy.

[17]  We note that "sex-based harassment that is not overtly sexual is nonetheless actionable under Title VII." O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001). Notwithstanding, Lexus' opinion as to whether Santiago's conduct constituted sexual harassment is irrelevant. This Court need only determine whether they acted promptly to stop the behavior after Plaintiff complained.

promptly in light of Plaintiff's complaints, and that a result of said intervention as well as Plaintiff's rebuttal, Santiago's alleged harassing behavior stopped.

Accordingly, Plaintiff fails to set forth a hostile work environment claim, and Lexus' request for summary judgment on this issue is also **GRANTED**.

*FMLA claims*

"The FMLA contains two distinct types of provisions: those establishing substantive rights and those providing protection for the exercise of those rights." Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 330 (1st Cir. 2005). Specifically, the FMLA guarantees eligible employees up to twelve work-weeks' leave per year when a serious personal or family medical condition makes the employee unable to perform the functions of his or her position. See 29 U.S.C. § 2612(a)(1). Tayag v. Lahey Clinic Hosp., Inc., 632 F.3d 788 (1st Cir. 2011); Roman v. Potter, 604 F.3d 34, 43 (1st Cir. 2010).[18] On the other hand, said statute provides a right of action for employees to recover based on an employer's interference with rights guaranteed by the act or for retaliation by employers against employees who exercise their FMLA rights. Roman v. Potter, 604 F.3d at 43 (citing 29 U.S.C. §§ 2615(a), 2617(a); 29 C.F.R. § 825.220(c)).

The employee bears the burden of proving that he was entitled to FMLA leave and that the employer violated the statute by denying him such leave. De Hoyos v. Bristol Labs. Corp., 218 F. Supp. 2d 222, 224 (D.P.R. 2002). In order to state a valid claim under the FMLA, Plaintiff must plead facts showing that: (1) she qualifies as an "eligible employee" under the

---

[18] The leave "may be taken intermittently . . . when medically necessary," Tayag, 632 F.3d 788 (citing 29 U.S.C. § 2612(b)(1)), and if the leave "is foreseeable based on planned medical treatment," the employee must make a reasonable effort to schedule the treatment so that it does not unduly disrupt the employer and must provide the employer with thirty days' notice unless impracticable, id. (citing 29 U.S.C. § 2612(e)(2)).

FMLA, as defined in 29 U.S.C. § 2611(2); (2) Lexus is an employer under the FMLA, as defined in 29 U.S.C. § 2611(4); (3) Plaintiff was entitled to leave under the FMLA, as defined in 29 U.S.C. § 2612(a)(1); and (4) she gave adequate notice to Lexus of her intention to take such leave. Id.

Plaintiff's argument that Lexus interfered with her rights under the FMLA because had they provided her reasonable accommodation, she "would have been able to receive the medical treatment necessary and would not have been forced to incur in absences," is unpersuasive. In the present case, Plaintiff failed to properly plead an FMLA claim insofar as she never requested FMLA leave, despite Lexus' repeated attempts for her to explore taking FMLA leave in order to adequately treat her ailments. As a matter of fact, the record clearly shows that Lexus informed Plaintiff on several occasions about her right to FMLA leave and never interfered with her right to claim such benefits. Moreover, Lexus did not condition Plaintiff's reasonable accommodation request to her filling out the FMLA forms but instead repeatedly requested that Plaintiff's physicians provide the medical information needed to properly evaluate her request for accommodation.

Considering the foregoing, and as Lexus correctly points out, Plaintiff's claims for interference of her FMLA rights are frivolous, and as such are **DISMISSED with prejudice**.

*Supplemental state law claims*

Having dismissed Plaintiff's federal law claims against Lexus, Plaintiff's state law claims against said Lexus are also dismissed. See Newman v. Burgin, 930 F.2d 955, 963 (1st Cir. 1991) (holding that "[t]he power of a federal court to hear and to determine sate-law claims in non-diversity cases depends upon the presence of at least one 'substantial' federal claim in the lawsuit.").

**Conclusion**

Based on the foregoing, Defendant's motion for summary judgment is **GRANTED.** Plaintiff's federal claims are **DISMISSED with prejudice**, and her state law claims are **DISMISSED without prejudice**.

In San Juan, Puerto Rico, this 4th day of April, 2011.

*S/ Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge